UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Marvin Edwards,                      :
       Plaintiff,                    :
                                     :
v.                                   :      Case No. 3:04cv1430 (JBA)
                                     :
Metro-North Commuter Railroad :
Company, et al.,                     :
       Defendants.                   :

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 28]

Plaintiff Marvin Edwards, an African-American man and former employee of defendant Metro-North Commuter Railroad Company ("Metro-North"), brought this suit against Metro-North, Metro-North Director of Power Systems James Gillies, and Metro-North Overhead Line Department General Supervisor Joseph Cleary, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, et seq., intentional infliction of emotional distress and breach of the implied covenant of good faith and fair dealing, and violations of 42 U.S.C. § 1983 and § 1985, in connection with his treatment while employed by Metro-North and his eventual termination on October 11, 2003.  Defendants now move for summary judgment on all of plaintiff's claims.  See Def. Motion [Doc. # 28].  For the reasons that follow, defendants' motion will be granted in part and denied in part.

1

## I.     FACTUAL BACKGROUND

Plaintiff began working at Metro-North in 1974 and eventually became qualified to perform the duties of a lineman and, ultimately, those of a "Class A" lineman.  Gillies Dep. [Doc. # 31, Ex. C] at 33-34.  A lineman is involved in building, maintaining, and repairing electrical systems, pole lines, and supports for railroad electrical services.  A Class A lineman has the same responsibilities and pay as a lineman but is also qualified to de-energize electrical current in sections of the railroad system in order to allow himself and/or others to safely work on those sections of the track.  Id.  While a Class A lineman receives the same pay as a lineman, the Class A status gives an employee priority in receiving overtime assignments and thus the potential for more hours and more income.  See Edwards Dep. [Doc. # 49 Ex. 15] at 44.

Over the last approximately 15 years of his employment with Metro-North, plaintiff established a substantial disciplinary record.  Pursuant to the collective bargaining agreement ("CBA") entered into between Metro-North and its employees' union, Metro-North must engage in a multi-step grievance procedure for adjudicating disciplinary actions.  See Gillies Aff. [Doc. # 31, Ex. B] ¶ 1.  An employee is entitled to an investigation or hearing at which the employee has the opportunity to be represented by the union, although in some circumstances the

department in which the employee works will offer the employee a "waiver" – essentially the option to plead guilty to the offense and accept the proposed discipline in lieu of a hearing.  <u>Id</u>. Between June 1986 and July 2000 plaintiff signed at least six waivers admitting offenses ranging from insubordination to failure to perform his Class A lineman duties to falsification of work reports and time records and accepting discipline including temporary suspensions without pay and temporary disqualifications from Class A lineman status.  <u>See</u> Waivers [Doc. # 31, Exs. G-K; Doc. # 49 Ex. 12].

Then, in October 2001, plaintiff was terminated for sleeping on duty and neglecting his Class A lineman duties by failing to protect a special work gang as directed and removing grounding devices and having a track re-energized without informing the foreman.  <u>See</u> Oct. 2001 Notice of Discipline [Doc. # 31, Ex. L]. Subsequently, in December 2001, Metro-North and plaintiff's union agreed that plaintiff would be restored to service and his discipline for the October offenses would be reduced to 61 days' suspension without pay and permanent disqualification from Class A lineman status "subject to the discretion of the Metro-North Power Department."  Dec. 2001 Letter [Doc. # 31, Ex. M]. Plaintiff testified that he was eventually given a re-certification test and was returned to Class A lineman status, and was told that the test was standard procedure in order for

him to resume his duties.  See Edwards Dep. at 63-64, 66.  About
a year later, plaintiff was disciplined for leaving a work
assignment four hours early and was given a 120-day suspension
and a nine-month disqualification from Class A lineman status.
November 2002 Waiver [Doc. # 31, Ex. N].  Plaintiff testified
that he was never requalified after this second disqualification
period and was told by supervisor Cleary to "just go out there"
without requalification; plaintiff agreed that at that time he
was still capable of performing all Class A lineman tasks.  See
Edwards Dep. at 84, 86-87, 238-42.  Then, in October 2003,
plaintiff was fired for making incorrect requests for power
clearances and failing to properly perform required testing,
resulting in an explosion and a fault to the power system.  See
December 2003 Notice of Discipline [Doc. # 31, Ex. O].  Cleary
testified that in his 38 years of employment at Metro-North, he
had "[n]ever known anyone to be terminated for causing a
workplace accident."  Cleary Dep. [Doc. # 49-2, Ex. 16] at 70.
While defendant contends that Gillies was solely responsible for
making the decision to terminate plaintiff, plaintiff claims that
supervisor Cleary also played a role.  After his termination, in
March 2003, plaintiff filed a charge of discrimination with the
Connecticut Commission on Human Rights and Opportunities
("CHRO").

     After the Assistant Director of Labor Relations denied

plaintiff's appeal from his termination, plaintiff took a final
appeal to the Special Board of Adjustment No. 934 ("SBA").  The
SBA observed that plaintiff "essentially admit[ted], and the
Board finds, that he erred as charged.  The critical question
before the Board, therefore, is whether, as asserted by the
Organization, the Carrier shares in the responsibility for
Appellant's actions, thereby mitigating [his] culpability
regarding the discipline imposed."  SBA Opinion [Doc. # 31, Ex.
P] at 6.  The SBA ultimately concluded that, while "termination
is particularly severe when, as here, it involves a long-term
employee," "when Appellant's actions are considered in light of
[his] prior discipline, the Board concludes that there is not a
clear and persuasive basis for substituting its judgment for that
of the Carrier in this matter.  Accordingly, the discipline must
stand."  Id. at 8.

On February 4, 2004, plaintiff filed a second race
discrimination charge with the CHRO; the CHRO returned a Merit
Assessment Review concluding that there was "no reasonable
possibility that investigating the complaint would result in a
finding of reasonable cause, and the complaint should be
dismissed because [t]he record indicates that the complainant was
discharged for a history of poor work performance."  CHRO Review
[Doc. # 31, Ex. Q] at 3.  Plaintiff subsequently initiated this
action.

## II.   STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Rodriguez v. City of N. Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Id. (citations omitted).  "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here

6

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her

favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)
("[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.").  In making this determination, the
Court draws all reasonable inferences in the light most favorable
to the party opposing the motion.  Matsushita, 475 U.S. at 587.
However, a party opposing summary judgment "may not rest upon the
mere allegations or denials of the adverse party's pleading,"
Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the
material facts" is insufficient.  Matsushita, 475 U.S. at 586
(citations omitted).

**III. DISCUSSION**

**A.   Title VII and CFEPA Claims (Counts 1, 2, 5)**

   **1.   Burden-Shifting Framework**

      As the parties acknowledge, this race discrimination case
should be analyzed under the McDonnell Douglas/Burdine three-
prong burden-shifting framework.[1]  Under that framework,
plaintiff first must establish a prima facie case of
discrimination on account of race.  See Weinstock v. Columbia
Univ., 224 F.3d 33, 42 (2d Cir. 2000).  To do so, he must prove:

---

      [1] CFEPA claims, as well as Title VII claims, are analyzed
under this framework.  See Burbank v. Blumenthal, 75 Fed. Appx.
857, 858 (2d Cir. 2003) (McDonnell Douglas analysis applicable to
plaintiff's state-law CFEPA claims); accord Dep't of Transp. v.
Comm'n on Human Rights and Opportunities, 272 Conn. 457, 463 &
n.9 (Conn. 2005).

(1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate "a legitimate, nondiscriminatory reason" for plaintiff's adverse employment action; "[t]his burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal citations, quotations, and alterations omitted). It is satisfied if the proffered evidence "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)). "Although the burden of production shifts to the defendant, the ultimate burden of persuading the trier of fact of intentional discrimination remains at all times with the plaintiff." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).

If defendant articulates a race-neutral basis for the adverse employment action(s), the burden then shifts back to plaintiff to "come forward with evidence that the defendant's

proffered, non-discriminatory reason is a mere pretext for actual discrimination." <u>Weinstock</u>, 224 F.3d at 42.  The plaintiff "may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." <u>Reeves</u>, 530 U.S. at 143. Thus, a plaintiff's <u>prima facie</u> case combined with sufficient evidence to find that the defendant's proffered justification is pretextual will be sufficient to survive summary judgment because a jury would be permitted to infer from such evidence that defendant's real reason for the employment action was discriminatory.  <u>Id</u>. at 148.

   **2.  Discrimination**

   <u>Prima Facie Case</u>

   "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." <u>Scaria v. Rubin</u>, 117 F.3d 652, 654 (2d Cir. 1997).  The first element – membership in a protected class – is not disputed.  As to the second element – whether plaintiff was qualified for his position – "all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." <u>See</u> <u>Slattery v. Swiss Reins. America Corp.</u>, 248 F.3d 87, 91-92 (2d Cir. 2001).  While plaintiff admits that he signed waivers accepting discipline for various violations of his obligations, such waivers do not

establish that plaintiff cannot meet the relatively <u>de</u> <u>minimis</u>
burden of showing he was qualified for his position, particularly
where he was permitted to resume Class A lineman duties after his
last instance of discipline, even if not officially re-qualified
to do so.  Thus, defendants have not met their burden of
demonstrating an absence of material fact on this element of the
<u>prima</u> <u>facie</u> case.

Consideration of the third element – existence of an adverse
employment action – requires isolation of the specific actions
claimed by plaintiff.  That plaintiff's termination constitutes
an adverse employment action is not disputed.  Plaintiff also
identifies, however, defendant's failure to provide him with
protective equipment, defendant's refusal to re-qualify him to
Class A lineman status, and excessive surveillance or "hounding"
as adverse employment actions.

An adverse employment action is a "materially adverse change
in the terms and conditions of employment."  <u>Weeks v. N.Y. State</u>
<u>Div. of Parole</u>, 273 F.3d 76, 85 (2d Cir. 2001), <u>abrogated on</u>
<u>other grounds by</u>, <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S.
101 (2002).  The Second Circuit has defined this requirement
"broadly," to include "refusal to hire, refusal to promote,
demotion, reduction in pay, and reprimand" as well as "lesser
actions" that may meet the adversity threshold based on the
factual circumstances and context of the action.  See <u>Hoyt v.</u>

11

Andreucci, 433 F.3d 320, 328 (2d Cir. 2006) (citing, inter alia,
Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997)
for the proposition that "whether an undesirable employment
action qualifies as being 'adverse' is a heavily fact-specific,
contextual determination").   "To sustain an adverse employment
action, a plaintiff must endure a materially adverse change in
the terms and conditions of employment. . . . A 'material[ly]
adverse change is one that has an attendant negative result, a
deprivation of a position or an opportunity." Figueroa v. City
of N.Y., 198 F. Supp. 2d 555, 567-68 (S.D.N.Y. 2002) (citing
cases).

     Accordingly, the refusal to requalify plaintiff as a Class A
lineman, to the extent that such failure limited plaintiff's
opportunity to receive overtime assignments, can constitute an
adverse employment action if it adversely impacted his ability to
make additional money.  Further, failure to provide plaintiff
with protective equipment which every other worker on plaintiff's
gang had, and which it was company policy to provide, also could
constitute an adverse employment action because it exposed
plaintiff to potentially unreasonably dangerous working
conditions.[2]  However, plaintiff's claim of excessive

---

     [2] See O'Neal v. City of Chicago, 392 F.3d 909, 911 (7th Cir.
2004) (adverse employment action is shown where "employee is not
moved to a different job or the skill requirements of her present
job altered, but the conditions in which she works are changed in
a way that subjects her to a humiliating, degrading, unsafe,

surveillance at work ("hounding") does not constitute an adverse employment action.  See id. at 568 ("Being followed by supervisors is not a materially adverse employment action. Although reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.") (internal quotation omitted).

There is also record evidence which could support an inference that the above adverse employment actions were made for a discriminatory purpose.  As to plaintiff's termination, plaintiff points to non-African-American Metro-North employees who committed the same violations as he did, yet were not terminated.  See Edwards Aff. [Doc. # 49, Ex. 4] ¶¶ 21, 23. Plaintiff also testifies that at least one of these individuals had been previously terminated, as he had been.  See Edwards Dep. at 110.[3]  See generally Shumway v. United Parcel Service, Inc.,

---

unhealthful, or otherwise significantly negative alteration in her workplace environment") (emphasis added); Patrolmen's Benevolent Ass'n v. City of N.Y., 310 F.3d 43, 51-52 (2d Cir. 2002) (transfer of plaintiff police officer to a different precinct where, inter alia, he feared for his safety, constituted an adverse employment action for Title VII discrimination purposes); Young v. Rogers & Wells LLP, 00civ8019 (GEL), 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002) (disproportionately heavy workload might constitute an adverse employment action if the additional work exposed the worker to "dangerous or extreme conditions not appropriate to her job classification").

[3] Defendants' claim that plaintiff has not adduced sufficient evidence of similarity with these comparators is addressed below, in the Court's examination of pretext evidence.

118 F.3d 60, 64 (2d Cir. 1997) (plaintiff must show he was treated differently from similarly situated non-African-American individuals).  Similarly, supervisor Cleary testified that in his almost 40 years of employment at Metro-North, no one else was fired for causing a workplace accident.  Cleary Dep. at 70.

As to Metro-North's failure to officially requalify plaintiff as a Class A lineman, thus potentially restraining his ability to work additional hours and collect overtime pay, plaintiff testified that it was Metro-North's policy (as described to him by Cleary and Cleary's supervisor) to have employees take a certification test to become officially requalified after expiration of any suspension period, see Edwards Dep. at 63-64, 66, but Metro-North did not follow its policy in this circumstance (although it had previously when plaintiff was temporarily disqualified).

As to the failure to provide protective equipment, plaintiff and his former foreman, Raymond Norris, both testified that it was Metro-North policy to provide everyone with protective equipment, and that others were provided with equipment during this time.  Edwards Dep. at 183-84, 186-87; Norris Aff. [Doc. # 49-1, Ex. 2] ¶ 8.  Plaintiff further testified that he was thus forced to perform the same jobs as other Caucasian employees, but without protective gear.  Edwards Dep. at 102.

These circumstances support an inference that these adverse

14

actions were taken based on discriminatory animus, and plaintiff has thus adduced evidence to satisfy his <u>prima</u> <u>facie</u> case.

<u>Pretext</u>

Plaintiff having adduced evidence to satisfy his <u>prima</u> <u>facie</u> case of discrimination, the burden shifts to defendants to articulate legitimate nondiscriminatory reasons for the adverse action taken, which they have done.  Specifically, defendants claim that plaintiff was terminated due to his failure to identify the correct section of the track to be de-energized and his improper testing of wires, which resulted in an explosion, coupled with his already extensive disciplinary history. Defendants claim plaintiff was not officially requalified as a Class A lineman because Metro-North policy requires only that Class A linemen receive training, demonstrate proficiency, pass the required exams, and be approved, not that they be officially "requalified" after temporary suspensions.  Lastly, defendants contend that plaintiff was not provided protective gear because they believed he had already received such gear in 2001 and due to problems with their supplier.  Defendants also contend that plaintiff had access to gear kept in the truck provided to his work gang.

The burden thus shifts back to plaintiff to identify record evidence which would support a finding that defendant's proffered nondiscriminatory reasons for the adverse actions taken against

15

him are pretextual, which plaintiff has done.

Regarding plaintiff's termination, defendants claim plaintiff was fired due to his disciplinary record and they contend that he has not demonstrated that the other employees to whom he compares himself were "similarly situated in all material respects."  However, plaintiff has produced evidence that other employees committed the same violations as he did and were not terminated, and also testified that at least one of these employees had been previously terminated, as he had been.  It is defendant's burden to show an absence of material fact and defendant has not produced the disciplinary records of these individuals to conclusively demonstrate a lack of similarity.[4] Rather, as noted above, Cleary himself testified that in his almost 40 years at Metro-North, he had never known anyone to be terminated for causing a workplace accident at Metro-North. Cleary Dep. at 70.  That plaintiff does not have personal knowledge one way or the other as to the disciplinary records of all of the alleged comparators does not suffice to show an absence of disputed material fact for summary judgment purposes where plaintiff has testified that these individuals committed

_____

[4] While Gillies claims that no other employee, "White or Black, had as serious a record as Mr. Edwards [sic] – of three major incidents of discipline within a three-year period," Gillies Aff. [Doc. # 31, Ex. B] ¶ 3, this is disputed, with plaintiff pointing to evidence that at least one of these other individuals had a reasonably comparable record.

similar violations as he did and that at least one of the
individuals also had a serious disciplinary history inasmuch as
he had previously been terminated, and defendants have proffered
no evidence of disciplinary records showing a lack of similarity.
At trial plaintiff will have the burden of proving disparate
treatment by showing these claimed comparators were "similarly
situated in all material respects" to plaintiff, but he need not
do so at this stage; plaintiff has adduced sufficient evidence of
disparate treatment by identifying similarities between himself
and these other individuals, and defendants have not demonstrated
an absence of disputed material fact as to lack of similarity.

As to the failure to requalify plaintiff for Class A status,
defendants argue this claim is a red herring because
requalification was not required.  However, plaintiff has adduced
sufficient evidence of pretext by his testimony that he was told
that it was Metro-North policy to have a disqualified lineman
take a test to become requalified, that it was part of the CBA,
and that he in fact was previously required to take such a test
when he had been temporarily disqualified.  <u>See</u> Edwards Dep. at
63-64, 66.  That plaintiff testified that at the time he was
told to "just go out there" he believed he could still perform
all the tasks of a Class A lineman, and that defendants now claim
plaintiff had all the necessary training to enable him to perform
such tasks, is irrelevant – the import of the formal

requalification procedure is that without it, according to plaintiff, he would not receive priority for the overtime assignments and the corresponding additional pay.  Based on plaintiff's testimony that it was Metro-North policy to requalify, a policy that had previously been applied to plaintiff himself, a jury could conclude that defendants' proffered reason for their failure to officially requalify him was pretextual.

Last, as to the failure of defendants to provide plaintiff with protective gear, defendants' proffered reasons for their failure to provide the gear are contradictory, thus supporting an inference of pretext themselves, as defendants claim that plaintiff did not receive protective gear because he already had a set issued in 2001, while at the same time contending that he was not given gear due to a vendor problem.  Additionally, although defendants claim that they believed plaintiff already had protective equipment, there is evidence in the record that both Cleary and Gillies knew that plaintiff was working without it.  See Cleary Dep. at 31-32; Gillies Dep. at 13, 105; Norris Aff. ¶ 8 (Norris repeatedly requested safety gear for plaintiff); Third Request for Safety Equipment [Doc. # 49, Ex. 6].  Plaintiff also disputes this claim by explaining that he returned his previously issued gear when he was first terminated in 2001.  See Edwards Dep. at 175-76, 181-87, 221-24, 250. Further, although defendants contend that there was an extra set of gear in the

18

work gang's truck which plaintiff could have used, Metro-North policy was to provide each employee with personally sized equipment, and both Gillies and Cleary acknowledged the importance of such equipment.  <u>See</u> Gillies Dep. at 72-73 (Metro-North policy to provide flame-retardant clothing and gloves); 21-22 (people are measured for gloves); 24-25 (Class A linemen required to wear protective equipment when performing certain tasks); Cleary Dep. at 49 (everyone working in close proximity to the lines should wear flame retardant safety equipment). Additionally, according to plaintiff, there was no flame retardant coat in the truck available for use.  Further, while defendants attribute the failure to supply the gear to a vendor problem, both plaintiff and his foreman, Raymond Norris, testified that other employees received gear.  Edwards Dep. at 183-84, 186-87; Norris Aff. ¶ 8 ("This safety gear was routinely issued to similarly situated White Linemen working at Metro-North" and "Any employee that was hired in the Power Department was automatically issued this safety equipment.").  Moreover, another supervisor who sits in the same office as Cleary told plaintiff "it is going to take an act of Congress to get you the coat," Edwards Dep. at 184-85, suggesting it was a management decision, not a vendor issue.

Thus, plaintiff has adduced sufficient evidence of pretext which, combined with his <u>prima facie</u> case, could support an

inference of race discrimination, to survive summary judgment.

### 3.   Retaliation

Prima Facie Case

To establish a prima facie case of retaliation, an employee must show "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996).  In demonstrating the "protected activity" element, "an employee need not establish that the conduct [he] opposed was in fact a violation of Title VII," but he must show "that [he] had a good faith, reasonable belief that the underlying employment practice was unlawful." Id. (citing Manoharan v. Columbia Univ., 842 F.2d 590, 593 (2d Cir. 1988)). The same 3-step burden-shifting analysis applies to retaliation claims as it does to discrimination claims.  See Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991).

Examining the "protected activity" element first, plaintiff identifies two types of protected activity: his involvement as a plaintiff in a class action discrimination lawsuit in New York in the mid-1990s, and the filing of at least one CHRO complaint in

March 2003, prior to his termination.[5]  There also must be
evidence in the record which would support an inference that
plaintiff had a good faith reasonable belief that the conduct
which he was opposing (claimed race discrimination) was unlawful.
This requirement implicates both a subjective good faith belief
on the part of the plaintiff, as well as an objective reasonable
belief.  "The reasonableness of the plaintiff's belief is to be
assessed in light of the totality of the circumstances."
Galdieri-Ambrosini v. Nat'l Realty & Development Corp., 136 F.3d
276, 292 (2d Cir. 1998).  Plaintiff's genuine good faith belief
that defendants were unlawfully discriminating against him is not
disputed and, in light of the evidence detailed above supporting
inferences of pretext and discrimination on the part of
defendants, a jury could also reasonably conclude plaintiff's
belief was objectively reasonable.

As to the second element, notwithstanding claims by Cleary
and Gillies that they were not aware of plaintiff's involvement
in the class action lawsuit, plaintiff testifies that they knew
of his participation as evidenced by comments made by supervisors
that he "didn't do too good" in the lawsuit, and because Cleary

---

[5] Plaintiff testified that he also made informal complaints
of race discrimination and retaliation.  However, although
"protected activity" includes such informal complaints, see
Kotcher v. Rosa & Sullivan Appliance Ctr. Inc., 957 F.2d 59, 65
(2d Cir. 1992), plaintiff could not recall the specifics of the
timing of such complaints.

was deposed in the suit.  Edwards Dep. [Doc. # 49, Ex. 15] at
220-21.  As to the March 2003 CHRO charge, an inference could be
drawn that Cleary was aware of that charge because the CHRO
contacted Metro-North after the filing of the charge and Cleary
was specifically mentioned in the charge.  Id. at 261-63, 265.
Thus, plaintiff has satisfied the first two elements.

     In his retaliation claim, plaintiff identifies the same
claimed adverse employment actions as he did in his
discrimination claim.  The Supreme Court recently held in
Burlington Northern & Sante Fe Railway Co. v. White, 126 S. Ct.
2405, 2412-13 (2006), that "unlike the substantive [Title VII]
provision, [the anti-retaliation provision of Title VII] is not
limited to discriminatory actions that affect the terms and
conditions of employment."  The Supreme Court stated that in
order to show an adverse employment action in the retaliation
context, "a plaintiff must show that a reasonable employee would
have found the challenged action materially adverse, which in
this context means it well might have dissuaded a reasonable
worker from making or supporting a charge of discrimination."
Id. at 2415.  The Supreme Court observed that "the significance
of any given act of retaliation will often depend upon the
particular circumstances.  Context matters."  Id.

     Thus, given this broad scope of the retaliation adverse
employment action, as compared to that in the discrimination

22

context, the three adverse employment actions found above in the discrimination context (termination, failure to requalify, failure to provide protective gear) also apply here.  In light of the Supreme Court's admonition that the significance of a purportedly adverse act must be determined based upon the particular circumstances, whether the claimed excessive surveillance, or "hounding," plaintiff experienced was sufficient given the circumstances to "dissuade[] a reasonable employee from making or supporting a charge of discrimination," id., seems a question best determined by a jury after presentation of all the evidence at trial.  Accordingly, all of these claimed adverse employment actions remain in play.

Turning next to examination of the last element of the prima facie retaliation case – a causal connection between the protected activity and the adverse employment action(s) – a temporal connection between the protected activity and the adverse employment action is sufficient to support an inference of a causal connection.  See, e.g., Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980) (eight-month gap between filing of EEOC complaint and retaliatory action suggested a causal relationship); Suggs v. Port Authority of N.Y. & N.J., 97civ4026 (RPP), 1999 WL 269905, at *6 (S.D.N.Y. May 4, 1999) (termination six months after plaintiff filed an EEOC charge was "sufficient close in time to raise an inference of retaliation);

Bernhardt v. Interbank of N.Y., 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (eleven months between protected activity and termination might suggest causal link where defendant had reasons for delaying termination).

Here, plaintiff participated in a class action race-discrimination lawsuit which was filed in the mid-1990s, but was not settled until December 2002.  Further, he filed a CHRO charge in March 2003.  The claimed adverse employment actions span the same time period, according to plaintiff's testimony, with the "hounding" commencing after the filing of the class action in the mid-1990s, the refusal to provide plaintiff with protective equipment beginning after he returned to work in December 2001, the failure to requalify plaintiff to Class A lineman duties after his return from suspension in October 2002, and his termination in October 2003.  Thus, while the connection between the filing of the class action lawsuit and plaintiff's termination alone is too attenuated, there exists a series of temporally related instances of protected activity and subsequent adverse employment action, most significantly the filing of plaintiff's CHRO charge in March 2003 and his termination in October 2003, that would support an inference of a causal connection between the protected activity and adverse actions. Accordingly, plaintiff has adduced sufficient evidence to survive summary judgment on this ground.

Pretext

Defendants have met their burden of articulating a legitimate non-retaliatory reason for plaintiff's termination by giving the same reasons they gave in the discrimination context. However, the same evidence discussed above in the discrimination section which supports an inference of pretext in that context supports a similar inference here.  Specifically, the evidence of other individuals who committed the same violations as plaintiff and were not fired, as well as Cleary's comment that he was not aware of any other individual who had been terminated for causing a workplace accident, supports an inference that defendants' proffered reasons for plaintiff's termination are pretextual. Also supporting this inference is the fact that plaintiff committed similar violations prior to the settlement of the class action lawsuit and the filing of his 2003 CHRO complaint and was not fired for those violations.  As to the requalification, while defendants claim it was unnecessary and that plaintiff was capable of performing Class A lineman duties without it, these contentions contradict what plaintiff was previously told about Metro-North policy.  Defendants' proffered reasons for their failure to provide plaintiff with protective gear are, as detailed above, internally inconsistent and could be proved pretextual based on the evidence that defendants knew plaintiff did not have any protective gear, knew that the gloves available

25

for common use were not sized to plaintiff's hands, and provided safety equipment to other individuals.[6]

Thus, plaintiff has adduced sufficient evidence of pretext which, when combined with the evidence supporting his <u>prima facie</u> case, could support an inference of retaliatory treatment, and defendants' motion for summary judgment on plaintiff's retaliation claims is therefore denied.

## B.   Intentional Infliction of Emotional Distress Claim (Count 3)

Defendants contend plaintiff's intentional infliction of emotional distress claim is preempted by the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, <u>et seq</u>., and that, further, summary judgment is appropriate because none of defendants' conduct rises to the level necessary to succeed on such a claim.

Examining the preemption argument first, "Congress' purpose in passing the RLA establishes a mandatory arbitral mechanism for the 'prompt and orderly settlement' of two classes of disputes." <u>Hawaiian Airlines, Inc. v. Norris</u>, 512 U.S. 246, 252 (1994) (citing 45 U.S.C. § 151a).  "The first class, those concerning 'rates of pay, rules or working conditions,' are deemed 'major disputes.'  Major disputes relate to 'the formation of collective bargaining agreements or efforts to secure them.'" <u>Id</u>. (citing 45 U.S.C. § 151a, <u>Consol. Rail Corp. v. Railway Labor Executives</u>

---

[6] As to the hounding and other harassment claimed by plaintiff, defendants dispute that they occurred and thus do not offer any legitimate nondiscriminatory reason for such treatment.

Ass'n, 491 U.S. 299, 302 (1989)).  "The second class of disputes, known as 'minor' disputes, 'grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.'  Minor disputes involve 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation."  Id. (citing 45 U.S.C. § 151a).  "Thus, major disputes seek to create contractual rights, minor disputes to enforce them."  Id.

Defendants claim that plaintiff's intentional infliction of emotional distress claim constitutes a "minor dispute" and is thus preempted by the RLA.  The Supreme Court has "defined minor disputes as those involving the interpretation or application of existing labor agreements."  Id. at 256.  Accordingly, "the RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA."  Id.  Plaintiff's intentional infliction of emotional distress claim, at least insofar as it arises out of defendants' failure to provide plaintiff with protective equipment (which, as described below, is the only conduct which supports plaintiff's claim), falls into this class of rights that are independent of, and thus do not require interpretation of, the CBA.

The gravamen of plaintiff's intentional infliction of emotional distress claim as it relates to the failure to provide protective equipment is that defendants knew plaintiff was

27

working without such equipment, knew the danger involved in
performing such work unprotected, and nonetheless failed to
provide the requested equipment.  Although proof of plaintiff's
intentional infliction of emotional distress claim may include
evidence of Metro-North's policy or a CBA provision concerning
provision of such equipment, the CBA does not provide the source
of plaintiff's rights asserted in this claim, nor will
interpretation of the CBA be required.  Defendant has pointed to
no particular policy or CBA provision whereby plaintiff could
have administratively challenged the alleged failure to provide
him with protective gear.  Thus, the only questions that need to
be resolved in this claim are purely factual questions centering
on plaintiff's circumstances and upon the conduct and motives of
defendants.  Accordingly, plaintiff's intentional infliction of
emotional distress claim – limited to the failure to provide him
with protective equipment – is not preempted by the RLA.  See Gay
v. Carlson, 60 F.3d 83, 88 (2d Cir. 1995) (plaintiff's
intentional infliction of emotional distress claim (among other
claims) not preempted by the RLA because "[n]o interpretation of
the collective bargaining agreement is required to resolve these
claims [and] state law provides the only source of the rights
asserted by [plaintiff]. . . . The only questions that need to be
resolved in [plaintiff's] lawsuit are purely factual questions
that center upon his conduct and upon the conduct and motives of

28

his fellow employees, the defendants in the action").

As noted above, the record supports plaintiff's intentional infliction of emotional distress claim only insofar as it arises out of the failure to provide plaintiff with protective equipment, but not encompassing any of the other wrongful conduct (such as termination) claimed by plaintiff.  The elements of an intentional infliction of emotional distress claim are: (1) that defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of its conduct; (2) that the conduct was extreme and outrageous; (3) that defendant's conduct was the cause of plaintiff's distress; and (4) that the emotional distress sustained by plaintiff was severe.  See Appleton v. Bd. of Educ. of the Town of Stonington, 254 Conn. 205, 210 (Conn. 2000).  The Connecticut Supreme Court has articulated the standard for "extreme and outrageous" conduct as follows:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.

Id. at 210-11.

29

As plaintiff appears to concede on reply, there is no
evidence in the record suggesting that plaintiff's termination,
his assignment to certain dangerous assignments, or the failure
to officially requalify him as a Class A lineman rises to this
level.  However, as to the failure to provide equipment, the
record could support a finding that defendants' conduct was
sufficiently "outrageous" to support an intentional infliction of
emotional distress claim.  Specifically, there is evidence in the
record that plaintiff and his foreman, Raymond Norris, made
numerous requests for the equipment and that Gillies and Cleary
were aware that plaintiff was working without it.  Indeed, as
stated above, a supervisor who sits in the same office as Cleary
mocked plaintiff's repeated requests, stating "[w]ell, it is
going to take an act of Congress to get you the coat."  Edwards
Dep. at 184.  Additionally, both Gillies and Cleary recognized
the danger inherent in working near the lines without protective
equipment; Gillies even testified about "graphic videos" shown in
a training class which warn employees of the risks involved were
they not to wear the equipment.  Gillies Dep. at 102.  From this,
a reasonable jury could conclude that defendants' conduct was
extreme and outrageous and that plaintiff suffered severe
emotional distress as a result, namely daily anxiety and fear for
his own physical safety.  Accordingly, defendants' motion for
summary judgment on plaintiff's intentional infliction of

emotional distress claim will be denied.

## C.   Breach of Implied Covenant of Good Faith and Fair Dealing Claim (Count 4)

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing alleges that there is an implied contract between the parties that would create a just, reasonable and fair agreement between the parties and defendants breached that contract in bad faith.  Defendants argue that this common law cause of action is not available to plaintiff because he has other, alternative statutory remedies available to him, and because it is preempted by the RLA.  Plaintiff appears to concede defendants' arguments because he poses no opposition in his briefing.  Accordingly, summary judgment as to this claim will be granted.

_____ In order to establish a claim for breach of the implied covenant of good faith and fair dealing, plaintiff "must allege either that an enforceable employment contract exists, or that the employer's actions in discharging the employee violated a recognized public policy." Cowen v. Federal Express Corp., 25 F. Supp. 2d 33, 37 (D. Conn. 1998) (citing, inter alia, Carbone v. Atlantic Richfield Co., 204 Conn. 460, 467 (Conn. 1987)).  To the extent plaintiff's claim relies on an enforceable employment contract, it is preempted by the RLA, as conceded by plaintiff. Alternatively, to the extent plaintiff's claim is based on a purported violation of public policy, it is nonetheless barred.

31

The cases that have established such a claim have done so based on the theory that "the employee was otherwise without [a] remedy and . . . permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." See Atkins v. Bridgeport Hydraulic Co., 5 Conn. App. 643, 648 (Conn. App. Ct. 1985). Therefore, because plaintiff in this case has other available statutory remedies for his termination (i.e., Title VII and CFEPA), he may not also bring an action for breach of the implied covenant of good faith and fair dealing. See Canty v. Rudy's Limousine, 04CV1678 (CFD), 2005 WL 2297410, at *4 (D. Conn. Sept. 15, 2005).

## D.   § 1985 Claim (Count 6)

Count 6 claims that the individual defendants conspired to deprive plaintiff by force, intimidation and threats of his rights as a citizen. Defendants contend that summary judgment on this claim is warranted because plaintiff's conclusory allegations – without any evidence in the record – cannot establish a prima facie case. Defendants also argue that as a general matter a conspiracy cannot exist between two or more employees of a corporate entity. Plaintiff does not appear to oppose defendants' motion on this claim and for the reasons that follow, summary judgment on this claim will be granted.

42 U.S.C. § 1985(3) prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class

32

of persons of the equal protection of the laws, or of equal
privileges and immunities under the laws" and provides that "in
any case of conspiracy set forth in this section, if one or more
persons engaged therein do, or cause to be done, any act in
furtherance of the object of such conspiracy, whereby another is
injured in his person or property, or deprived of having and
exercising any right or privilege of a citizen of the United
States, the party so injured or deprived may have an action for
the recovery of damages occasioned by such injury or deprivation,
against any one or more of the conspirators."

     "To state a cause of action under § 1985(3), a plaintiff
must allege (1) a conspiracy (2) for the purpose of depriving a
person or class of persons of the equal protection of the laws,
or the equal privileges and immunities under the laws; (3) an
overt act in furtherance of the conspiracy; and (4) an injury to
the plaintiff's person or property, or a deprivation of a right
or privilege of a citizen of the United States." Thomas v.
Roach, 165 F.3d 137, 146 (2d Cir. 1999). "[A]n action will lie
under § 1985(3) when a plaintiff is injured by a private
conspiracy to interfere with his or her constitutional rights, so
long as there is some racial, or perhaps otherwise class-based,
invidiously discriminatory animus behind the conspirators'
action." Jews for Jesus, Inc. v. Jewish Cmty. Relations Council
of N.Y., Inc., 968 F.2d 286, 290-91 (2d Cir. 1992) (internal

quotation omitted).  However, "[a] complaint containing only
conclusory, vague, or general allegations of conspiracy to
deprive a person of constitutional rights cannot withstand a
motion to dismiss" and, similarly, "[a] mere hope on
[plaintiff's] part that further evidence may develop prior to
trial is an insufficient basis upon which to justify the denial
of summary judgment." Leon v. Murphy, 988 F.2d 303, 311 (2d Cir.
1993).

In fact, plaintiff does not claim even such a "mere hope,"
indeed he does not respond to defendant's arguments at all or
identify any evidence to support his conspiracy claim.  Further,
as defendants correctly observe, plaintiff does not allege or
proffer any evidence supporting any overt act made in furtherance
of the conspiracy, an essential element of the claim.  See
Thomas, 165 F.3d at 146.  Additionally, plaintiff's conspiracy
claim must fail because Gillies and Cleary, the alleged co-
conspirators, were both employees of Metro-North and acting
within the scope of their employment when they allegedly violated
plaintiff's rights.  "The intra-corporate conspiracy doctrine,
which holds that two or more employees of a corporate entity are
generally legally incapable of conspiring with each other with
respect to matters within the scope of their employment, applies
to Section 1985 claims and bars plaintiff's conspiracy cause of
action." See Scott v. Goord, 01civ847 (LTS) (AJP), 2004 WL

34

2403853, at *13 (S.D.N.Y. Oct. 27, 2004).

**E.   § 1983 Claim (Count 7)**

Count 7 asserts a claim pursuant to 42 U.S.C. § 1983 for deprivation of plaintiff's Fourteenth Amendment due process and equal protection rights by discriminating against him for exercising his First Amendment rights.  Defendants argue that they are entitled to summary judgment on this claim because plaintiff must identify some law other than Title VII as a source of the right alleged to have been denied, and plaintiff cannot do so in the form of the Fourteenth Amendment because plaintiff was afforded adequate due process and, further, because plaintiff cannot identify any statute, ordinance, regulation, custom or usage employed by Metro-North that caused the alleged harm. Plaintiff admits defendants' arguments by not responding to them.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  "In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been

35

committed by a person acting under color of state law; and (2)
the conduct complained of must have deprived a person of rights,
privileges, or immunities secured by the Constitution or laws of
the United States." <u>See</u> <u>Pitchell v. Callan</u>, 13 F.3d 545, 527 (2d
Cir. 1994).[7]

Section 1983 "is not itself a source of substantive rights,"
and may not be used to assert Title VII claims. <u>See</u> <u>Baker v.</u>
<u>McCollan</u>, 443 U.S. 137, 144 n. 3 (1979).  That is not to say that
a Title VII plaintiff is precluded from asserting a concurrent
Section 1983 claim, so long as "some law other than Title VII is
the source of the right alleged to have been denied." <u>Saulpaugh</u>
<u>v. Monroe Cmty. Hosp.</u>, 4 F.3d 134, 143 (2d Cir. 1993).  Thus,
plaintiff's claim is limited to his allegations that he was
deprived of his due process rights.  However, as defendants
argue, the record shows that before plaintiff was terminated he
was afforded, pursuant to the CBA, a hearing and two appeals.
Plaintiff offers no evidence from which it could be inferred that
these procedures did not satisfy plaintiff's due process rights
in some way. <u>See</u>, <u>e.g.</u> <u>Dykes v. Southeastern Penn. Transp.</u>
<u>Auth.</u>, 68 F.3d 1564, 1565 (3d Cir. 1995 ("[W]here an adequate

---

[7] Defendants do not dispute the first requirement that the
conduct be committed by a state actor.  The Court therefore
assumes, without deciding, that Metro-North and its employees
constitute state actors. <u>See also</u> <u>Verdon v. Consol. Rail Corp.</u>,
828 F. Supp. 1129, 1138 (S.D.N.Y. 1993) (concluding, without
analysis, that "Metro-North would clearly be a New York 'state
actor' for purposes of a § 1983 action").

grievance/arbitration procedure is in place and is followed, a plaintiff has received the due process to which he is entitled under the Fourteenth Amendment."). Thus, plaintiff cannot establish the second element of his Section 1983 claim and summary judgment must be granted as to this claim.

## IV.  CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment [Doc. # 28] is GRANTED IN PART as to plaintiff's claim for breach of the implied covenant of good faith and fair dealing claim and plaintiff's 42 U.S.C. § 1983 and § 1985 claims, and DENIED IN PART as to plaintiff's Title VII and CFEPA discrimination and retaliation claims and his claim for intentional infliction of emotional distress.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 27th day of September, 2006.**